## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TERRY PETER AUTHEMENT, JR.**

**VERSUS**

**PARISH OF TERREBONNE, STATE OF
LOUISIANA, SHERIFF OF
TERREBONNE PARISH, TPCJC,
MEDICAL DEPARTMENT IN TPCJC,
CPRL. MATTHEW JACCUZZO,
WARDEN LEEROY LIRETTE JR.**

**CIVIL ACTION**

**NO.  09-4618**

**UNITED STATES MAGISTRATE
JUDGE KAREN WELLS ROBY**

### ORDER AND REASONS

This matter was before the Court for non-jury trial upon consent of the parties pursuant to

28 U.S.C. § 636(c).[1]  On November 8, 2010, the Plaintiff, Terry Peter Authement Jr. ("Authement")

participated in a non-jury trial by conference telephone call and counsel for the Defendants, and their

witnesses, appeared in person before the Court.[2]

### I.     Testimony at Trial

The testimony and record reflects that, on Friday, June 19, 2009, Authement was a pretrial

detainee housed in isolation cell C-104 at the Terrebonne Parish Criminal Justice Complex

("TPCJC").  He came to be placed in that cell on suicide watch after he attempted to hang himself

earlier that same day.  The records indicated that Authement was angry because he wanted a

---

[1]Rec. Doc. Nos. 35, 37.

[2]Rec. Doc. No. 59.

mattress in his cell.  He also testified that he was emotionally upset, because of prior pain in his shoulder and because of prior sexual assaults by other inmates which plagued him.

When he was found with a noose, made out of a sheet or towel, around his neck, he was taken by prison guards to the medical unit.[3]  The nurse, who had no special training in the treatment of psychiatric patients, noted redness around his neck from the noose and advised Authement that he would be placed on suicide watch.[4]  He was scheduled to see a psychiatrist on Tuesday, June 23, 2009.

In the meantime, he was given a "blue suicide smock" to wear.[5]  The smock, demonstrated at trial, is an ankle-length smock which fastened by velcro around the inmate, who was left without undergarments.

The cell in which he was housed had upper and lower glass windows for observation.  On suicide watch, inmates were delivered three meals a day and checked frequently, in addition to occasional visual surveillance from the guard's pod.

At some point, according to Authement, his shoulder became dislocated.  In explanation, Authement stated that he has a recurring problem with his shoulder slipping out of the joint.  This was confirmed by the TPCJC medical administrator, Richard Neal.[6]  Authement can often get it back into place, but sometimes he requires medical assistance.  He claims that he requested assistance for

---

[3]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Doctors and Nurses Notes, 6/18/09 (actually occurring 12:30 a.m. on 6/19/09); Suicide Observation Log, 6/19/09.

[4]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Doctors and Nurses Notes (2 pages), 6/19/09; Doctors and Nurses Notes, 6/19/09.

[5]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Doctor and Nurses Notes, 6/19/09, 11:10 a.m. notation.

[6]For example, the medical records reflect that, shortly before he attempted suicide, he reported to Deputy Clark that his shoulder had just popped into place and was no longer causing him problems.  Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Doctors and Nurses Notes, 6/18/09.

his shoulder, which can be painful.  He recalled being told by someone in medical that, since he dislocated it himself, he would have to reset it himself.[7]

In an effort to gain attention, Authement placed paper over the window of his cell. According to the reports submitted to the Court prior to trial, this was about 3:40 p.m. on June 19, 2009.  The deputies were called to his cell, because papering the window blocked the view into the cell and is a safety concern, especially with an inmate on suicide watch.  The pod officer, Deputy Michael Dawson, who also testified at trial, opened the pod door to allow Corporal Matthew Jaccuzzo and Deputy Chad White to gain access to Authement's cell.  He opened the door to Authement's cell and the two officers entered.

According to the officers, Authement was on the floor complaining about his shoulder. Jaccuzzo and White escorted him out of the cell without incident.  Jaccuzzo remained with Authement up against the wall and White returned to the cell to remove the paper.  Dawson had to close White into the cell, because the sliding door blocked his access to the paper on the window. When he cleared the paper, Dawson opened the cell to let him out.  Dawson testified that he had visual contact of the cell and the area where Authement and Jaccuzzo stood, and he did not see Jaccuzzo do anything to Authement.  On Cross-Examination, Dawson testified that he was only able to see the right side of Authement and Jaccuzzo as they stood at the wall.

Authement testified that, while he was up against the wall, Jaccuzzo pushed him which caused the velcro on his smock to come undone, exposing his backside.  When he pushed him up against the wall, it also caused a scratch on his shoulder for which he still has a scar.  He claims that Jaccuzzo then stuck his finger into his anus, lifted it up, and then pulled it out, causing him pain and

---

[7]The Court notes that there is no evidence that the medical staff gave Authement treatment for his dislocated shoulder.

discomfort.  He stated that Jaccuzzo told him that he would continue to receive this kind of treatment when he misbehaved.  Authement also testified that, the next day, Jaccuzzo brought him a disciplinary write-up and told Authement that he would kill Authement if he lost his job because of the complaints against him.

 He wrote two request forms, which were responded to by Major LeeRoy Lirette.  These "requests" were entitled admission of guilt presumably suggested that if the prison staff did not respond, he would conclude that their failure to respond was an admission of their guilt.   He complains that despite these requests, he has never been treated for the injury from this incident.  Although Major Lirette responded to his request, his response was only that Authement's complaint was unfounded.  He did not address the subject of the request, which was the desire to be seen and treated by a medical provider for his physical problems.

Authement testified further that he had previously been raped in jail by a cell mate.  He filed suit related to that incident and was able to settle with the prison officials.  This was not contested by the defense.  He also stated that the assault by Corporal Jaccuzzo rekindled the memories of the prior rape and added to his mental distress.

He further testified that he reported the incident to EMT Melanie Naquin[8] and Deputy Thomas Clark.[9]  He also stated that on June 30, 2009, he tried to show Naquin a piece of bloody tissue to establish that he had been assaulted.  Instead of examining his rectum to determine if there was an injury, she reported his complaint again to someone; possibly the assistant warden, Lieutenant Mitchell Dupre.  According to Authement, Naquin was again told that Dupre was taking

---

[8]Authement referred to her as "Monique Naquin", and the records reflect her name to be "Melanie Naquin."

[9]*See* Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, attached Incident Report dated 6/19/09.

care of everything.  Authement testified that he still has not been seen for his injury, not even at his new facility.  However, he did get subsequent care for his shoulder at Allen Correctional Center.

At Terrebonne Parish, he was continually told to adjust his own shoulder.  He is not sure who these instructions came from in the medical unit.  Authement admitted that he did see the nurses and doctors after this incident, but he did not receive treatment for this incident.

Authement stated that he was not upset with the medical unit for failing to provide him with treatment after the assault.  Instead, he testified that it was the prison administration, specifically the Warden, who refused to send him for care because of the investigation.  He stated that he wrote two requests to the Warden.  He also filed a grievance complaint.  He received a denial because the criminal investigation deemed his claims to be false.  He completed three steps and received the same response.

Major LeeRoy Lirette, the Warden of TPCJC, testified that when an inmate wants medical treatment, he can complete a form and tell the medical staff when they make medication passes.  He saw Authement's grievance on June 22, 2009, when he returned to work after the incident.  He recalled that the incident happened on the evening of Friday, June 19, 2009, after hours.  He contacted the detective bureau, per prison policy, to have an outside investigator appointed.  Detective Wayne Smith was assigned to investigate Authement's claims.  He was not aware of whether Authement received medical treatment on June 19, 2009.

Major Lirette did not recall that Authement at some point sent a request for medical care to him in the form of a grievance claiming that his prior requests had been ignored.  Authement read to the Court from a response signed by Major Lirette stating that the investigation had been

concluded and that Authement claims were found to be false.[10] Major Lirette testified that he would have written that because the investigation was turned over and completed by the detective bureau. Major Lirette also testified that he was not aware of any complaints Authement may have made to be seen by a doctor on June 19, 2009.

Corporal Matthew Jaccuzzo testified at trial and repeatedly denied that this incident occurred. He stated that he noted Authement's complaints about his shoulder problem and escorted him out of the cell so that White could remove the paper. Jaccuzzo remained with Authement outside of the cell while White cleared the cell. He testified that he used a compliance hold, with one arm behind his back, to walk him out of the cell and keep him up against the wall. He was able to return Authement to his cell without incident. Jaccuzzo also confirmed that Authement did not resist their efforts to remove him and restrain him.

Richard Neal, the medical administrator at the TPCJC, confirmed that Authement orally reported the incident to an EMT on the evening of June 19, 2009. According to the medical records, referred to by Neal at trial and received prior to trial from the Defendants, Authement reported the incident to EMT Naquin and Deputy Little during the 8:00 p.m. medication pass out on June 19, 2009.[11] Naquin completed an incident report indicating that the report was made to her and she gave Authement two Tylenol tablets.[12] The report was signed by Naquin and a supervisor named Lieutenant Justin Hall.

---

[10]Authement stated that this report was submitted into the Court's record in connection with his prior motion for summary judgment. The referenced grievance request was dated September 15, 2009. (R. Doc. 42, p. 6.)

[11]Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, attached Incident Report (2 pages), dated 6/19/09.

[12]*Id.*, p. 2 of 2.

The records also reflect that Authement reported the incident again on June 22, 2009, to an EMT at the 4:00 p.m. medication pass-out.[13]  This EMT, whose name is not clear in the records, reported the matter to Lieutenant John Babin, who reportedly advised that "it was being taken care of."

According to Neal, inmates at TPCJC are allowed to request medical treatment by completing a medical request form or by orally reporting requests to the EMTs and nurses during medication pass-outs.  He indicated, as the custodian of the medical records, that Authement did not file any written requests for medical treatment related to this incident.  He indicated that when an incident such as this is reported to the medical personnel, the inmate is normally checked for any obvious physical complaints and the matter is referred to the grievance officers for internal investigation.  He also acknowledged that in this instance, the records did not indicate that Authement was examined or treated for his complaints of assault.

Neal and Captain Mitchell Dupre, the assistant warden, also testified that the prison staff determines whether an internal investigation is to be done or if it is referred to the Sheriff's detective bureau.  Once the matter is turned over to one of those units, the medical staff does not take any further action.  If the matter is referred to the detective bureau, the prison staff also takes no further action unless the results of the detective's investigation requires the prison to take action against the officer.  He stated that he would expect the detective bureau to pursue any physical examination or evidence as part of their investigation.  The detective's report when received is placed in the grievance files.  Captain Dupre could not recall whether he received or saw the investigative report in this case.

---

[13]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Doctors and Nurses Notes, 6/22/09.

Captain Dupre also testified that the decision to give immediate medical care after an incident is for the medical staff, not the correctional officers.  He also indicated that HIPPA laws limit the information they receive from the medical unit about an inmate's mental status.  The decision to place an inmate, like Authement, on suicide watch is based on incidents in the prison, like an attempted hanging.  Once the inmate is found with a noose around his neck, he is referred to medical for an examination, like Authement was.  Then he is placed in the blue suicide smock and put on suicide watch in the C100 area, where Authement was at the time of this incident.  Scheduling him for evaluation by the psychiatrist is left for the nursing staff to handle.  In this case, Authement was seen by Margie Whitney, RN, who confirmed his visible injuries from the noose and confirmed the need for suicide watch.

The psychiatrist, Dr. Lo, saw Authement on his next visit, which was three (3) days later on Tuesday, June 23, 2009.[14]  The psychiatrist noted that Authement's mood was appropriate and that he had no thought disorder, no abnormal movements, no auditory hallucinations, or delusions.  He also indicated that Authement did not have suicidal ideations.  The psychiatrist placed Authement on Thorozine[15] and discontinued the suicide watch.[16]

---

[14]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Psychiatric Progress Note, 6/23/09.

[15]Thorozine, which is also known as Chlorpromazine, is used to treat the symptoms of schizophrenia and other psychotic disorders and to treat the symptoms of mania in people who have bipolar disorder.  It is also used to treat severe behavior problems and to control nausea and vomiting.  See *Chlorpromazine*, U.S. National Library of Medicine National Institutes of Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000553 (last revised, November 1, 2008).

[16]*Id*.; Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Removed from Suicide Observation Log, 6/23/09.

Richard Neal confirmed in his testimony that the medical log showed that Authement was provided with the Thorozine but refused to take it.[17]  Authement testified that he did not want to take it because he did not believe that he was schizophrenic, a diagnosis he received years ago while incarcerated in the Elayn Hunt Correctional Center.  He indicated that he has a form of Tourette Syndrome, manifested by physical and oral tics, and a behavior disorder that causes him to lash out and cause trouble.  He stated that he complies with the medication given to him for his Tourette Syndrome.  He also denied to the Court that his behavior disorder caused him to fabricate his claims against Corporal Jaccuzzo.  Authement stated that he had been raped in jail by other inmates on two prior occasions and this incident has caused him added mental anguish.  The previous rapes, and the mental anguish they caused, are referenced in the "suicide note" attached to the psychiatrist's June 23, 2009, evaluation.[18]

Richard Neal further testified that, in this case, when the EMT was advised that Lieutenant Babin was handling the matter, the medical staff took no further action.  Neal could not explain why no medical personnel examined Authement for physical signs of abuse and why no one else referred Authement for examination to confirm the allegations.  Neal testified that the medical records indicated that when Authement did see Dr. Haydel about an ankle injury in September 2009, no mention of the incident with Corporal Jaccuzzo was noted.

Detective Wayne Smith testified that he was a fairly new detective who had no prior experience investigating sexual assaults in the prison setting.  However, he was the officer assigned by the detective bureau to investigate Authement's allegation of sexual assault by Jaccuzzo.  Smith

---

[17]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Medication Administration Record, 6/2009.

[18]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Psychiatric Progress Note, 6/23/09.

spoke with Authement on June 22, 2009, about the incident.[19]  He had a tape recorder with him at the interview, but he did not record the conversation.  Smith recalled that Authement told him that Jaccuzzo ripped the smock open and then shoved his finger up his anus.  Authement repeated that Jaccuzzo told him that he would continue to get treated like this if he continued to misbehave.

Smith also interviewed Jaccuzzo who denied the incident.  Deputy Dawson, the pod officer, told Smith that he was watching the entire time the officers were at the cell and he saw nothing occur.  However, Dawson told Smith that he could only see the right side of Authement and Jaccuzzo as they stood at the wall.  Smith also interviewed EMT Naquin, to whom Authement reported the incident.  Naquin did not report any complaints of physical injury, but she did give Authement two Tylenol tablets.  Based upon the information Smith gathered; the denial by Jaccuzzo, the lack of any medical report by the medical unit, and the configuration of the cell to the pod security, he concluded that there was no evidence that Corporal Jaccuzzo did anything to Authement.

Smith advised the Court that he spoke with his supervisor and they resolved that there was no need to gather any physical evidence.  He gratuitously explained that rape kits look for hair and body fluids which were not involved here.  He also stated that Authement made no complaints of physical injury to him but conceded that he did complain that Jaccuzzo inserted his finger up Authement's anus and then pulled it out.  He conceded that he did not send Authement for examination to determine if he had been violated.  Upon further questioning by the Court, Smith conceded that he did not see Authement's medical records nor did he ask Naquin if Authement had been examined.  He stated that he later thought it odd that Authement had never been examined.

---

[19]Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, dated 7/27/09.

## II.   Findings of Fact and Conclusions of Law

Several claims remain before the Court which are Authement's claims of excessive force under § 1983 against Corporal Jaccuzzo, battery under state law against Corporal Jaccuzzo, and Authement's state law negligence claim for denial of medical care against Major Lirette.  The record and evidence demonstrate to the Court that Authement was a problem inmate who was irritating to the prison staff, including the medical unit who often refused to assist him with his shoulder issues. This backdrop leads the Court to the evidence which showed that on June 19, 2009, Authement papered the window in his isolation cell which caused Corporal Jaccuzzo and Deputy White to approach his cell.  He was removed from the cell while White removed the paper.  It was during this time, as he waited with Jaccuzzo against the wall outside of the cell that the "sexual assault" occurred; that is, at this time is when Jaccuzzo placed his finger in Authement's anus, pulled up and out causing him discomfort which led to some bleeding and emotional upset.

### A.   Excessive Force under § 1983

The United States Fifth Circuit Court of Appeals has established a three-part test is to be used when evaluating a plaintiff's entitlement to relief from the use of excessive force under 42 U.S.C. § 1983.  Further, "a prisoner's right to bodily integrity and to be free from attack by prison guards is a clearly established constitutional right."  *Cooper v. Belcher*, No. 08-1599 c/w 08-2536 c/w 09-0662 c/w 09-0667 c/w 09-0754 c/w 09-0961, 2010 WL 3359709 (D. Co. Aug. 25, 2010) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993).

To prove this type of Eighth Amendment violation, the plaintiff must show: (1) some injury; (2) that resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable.  *Fontenot v. Cormier*, 56 F.3d 669, 674

(5th Cir. 1995); *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996); *Thompson v. City of Galveston*, No. G-97-246, 1997 WL 591134, at *5 (S.D. Tex. Sept. 19, 1997) (Kent, J.).  In evaluating excessive force claims, courts may look to the seriousness of the injury to determine "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Brown v. Lippard*, 472 F.3d 384, 386-87 (5th Cir. 2006).  An injury is insufficient to support an excessive force claim where there is no physical injury or where it is extremely minor.  *See e.g.*, *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999) (no injury); *Gomez v. Chandler*, 163 F.3d 921, 922 (5th Cir.1999) (cuts, scrapes, contusions to the face, head, and body not enough); *Siglar v. Hightower*, 112 F.3d 191 (5th Cir.1997) (bruise caused by having ear twisted considered *de minimis*).

When determining the reasonableness of the force used, the core inquiry is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998).  Determining a motive is not part of the Court's inquiry while intent is a factor to be considered.  *Hudson*, 503 U.S. at 7.  Some of the relevant objective factors in this inquiry include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the defendant; and (5) any efforts made to temper the severity of the forceful response.  *Id*. at 838-39.  Thus, the application of force is considered excessive by constitutional standards where it is "grossly disproportionate to the need for action and inspired by malice."  *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993).

The law is settled that "sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The federal courts have recognized that the evolving standards of decency demonstrate "a national consensus that any sexual assault of a prisoner by a prison employee constitutes cruel and unusual punishment."  *Rodriguez v. McClenning*, 399 F. Supp.2d 288, 238 (S.D.N.Y. 2005) (male prison guards fondling of male inmate's chest, genitals and buttocks under guise of a pat-frisk was cruel and unusual punishment).

Thus, sexual assault by a prison guard is not a legitimate nor permissible punishment under the Constitution.  *Cf. Cain v. Rock*, 67 F. Supp.2d 544 (D. Md. 1999) (while random act of sexual assault by a prisoner guard did not qualify as punishment for purposes of liability under the Eighth Amendment, the deliberate indifference to the inmates well-being can violate due process under the Fourteenth Amendment) (citing *George v. Evans*, 633 F.2d 413, 415-416 (5th Cir. 1980) (regarding the Eighth Amendment).  Furthermore, the federal courts have recognized that "given the 'power arrangements' in the prison environment, *see Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995), and the custodial role of correctional officers, a sexual assault by a guard is a shocking abuse of power, particularly where the inmate is mentally or physically incapacitated."

In the instant case, the testimony of Corporal Jaccuzzo, Deputy Dawson, and Detective Smith confirmed that, on June 19, 2009, Authement was not particularly non-compliant with the officers' efforts to remove him from his cell.  He was in physical pain from his dislocated shoulder, and he was already on suicide watch as a result of his weakened mental state.

The testimony demonstrated that Authement was escorted out of the cell in a compliance hold, that is with one arm folded behind his back, and the escort was without any resistance by Authement.  There was, according to the evidence, no need for more than minimal efforts to move Authement out of the cell and keep him up against the wall during the clearing of the cell.  Based on the foregoing factors, any force beyond that would have been disproportionate and excessive.

Two factual questions remain before the Court: (1) did Corporal Jaccuzzo stick his finger into Authement's anus?; and (2) did this cause more than a *de minimis* injury to Authement?  In addressing these questions, the Court has before it some testimony that Corporal Jaccuzzo did not assault Authement.  This comes from Corporal Jaccuzzo, who has consistently denied the actions alleged.  Deputy Dawson also testified that he saw nothing occur as he watched the incident unfold.  He conceded, however, that from his vantage point, he could only see the right side of Jaccuzzo and Authement as they stood at the wall.

This leaves the Court with a swearing match between Authement and Jaccuzzo, of course with the burden of proof falling on Authement.  The Court, nevertheless, finds for the following reasons, that Authement's testimony about this event is credible.

The evidence indicates that there is no dispute that Authement has continually complained about this incident.  The evidence is also without dispute that no one gave him medical care in spite of the investigation into the incident.  The point is, other than Corporal Jaccuzzo's denial that the incident occurred, Authement's claims have been mostly uncontested and borne out by the evidence.  This lends itself to a finding that Authement's testimony is credible.

The record also tends to provide a basis for Authement's claims that Jaccuzzo was agitated and threatened him that similar treatment would occur if he continued to cause trouble.  Though not

14

addressed by the witnesses at trial, the investigative report, specifically the interview with Deputy White, reflects that this was not the first confrontation between White, Jaccuzzo, and Authement that day.   According to Detective Smith's report, White stated that Jaccuzzo notified him at approximately 3:00 p.m. on June 19, 2009, that Authement was papering the window to his cell.[20] When they approached, he complained that his shoulder was dislocated and he needed to see the nurse about his shoulder.   He was told that they would contact the medical unit.   He was directed to remove the paper and he complied.   Forty-five minutes later, at 3:45 p.m., Jaccuzzo again notified White that Authement was papering his window.   It was during this event that the sexual assault occurred forming the basis of Authement's claims before the Court.

The fact that the prior incident occurred and went unmentioned by any of the defense witnesses is at least curious to the Court.   It also supports Authement's suggestion that Jaccuzzo was aggravated by the situation and Authement's repeated disruptive behavior.   As noted above, Jaccuzzo completely denies the incident occurred.[21]

The evidence also established that Authement has a history of defiant behavior in the prison. This he concedes.   The evidence also shows that Authement's behavioral issues have not involved falsifications of fact.   His acting-out has been, by his own admission, in the nature of papering his cell window and mouthing-off at or shoving on others.   His mental history does not lead the Court to believe that he hallucinates or manufacturers accusations.   In fact, the medical records and testimony confirm that even the Terrebonne Parish psychiatrist questioned whether he was

---

[20]Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, Incident Report, dated 6/22/09.

[21]There is also no indication that any rectal contact resulted from a contraband search or some other security measure on behalf of Jaccuzzo.   *See e.g.*, *Brown v. Brooks*, No. 09-6762, 2010 WL 2772659, at *2 (E.D. La. Jun. 17, 2010) (Report and Recommendation finding cavity search for contraband did not violate prisoner's rights).

schizophrenic, and he did not diagnose Authement with or treat him for schizophrenia.[22]  Although Authement was given Thorozine after the suicide watch, no diagnosis was entered.  The psychiatrist actually noted on June 23, 2009, that he was not suicidal, delusional or hallucinating.[23]  Also, Authement did not take the Thorozine, and it was readily discontinued.

The testimony further demonstrated that Authement had been a victim to at least one other rape by another inmate.  This was listed as a cause for his general upset and contributed to his suicidal behavior.  The Court notes that it is not uncommon for a prisoner who has been raped once before to be targeted as a victim for other such attacks.[24]

The evidence in this case also demonstrates that Authement complained about the assault within hours after it occurred.  His story has been consistent, though no physical evidence exists that he suffered a rectal injury.  This leads the Court to the next inquiry.

The reason why no confirming evidence exists of the rectal bleeding or any injury is because no one at the prison, in the medical department, or during the investigation, ever examined or treated Authement about his complaints of pain and bleeding.  He testified that he tried to show bloody tissue to the medical staff, but it was ignored.  He argued at trial that he was told by the detective that he would be sent to medical, something Detective Smith denied saying.  He made complaints to the medical staff, yet no one examined him.  Further, according to Detective Smith's report, there

---

[22]*See*, e.g., Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Initial Patient Psychiatric Evaluation, 5/12/09.

[23]Rec. Doc. No. 60, Court's Trial Exhibit 1, Volume 3, Psychiatric Progress Note, 6/23/09.

[24]*Truths About Sexual Abuse in U.S. Detention Facilities*, Fact Sheet (Just Detention International, Washington D.C.), Feb. 2009, at 1 (citing Christopher D. Man & John P. Cronan, *Forecasting Sexual Abuse in Prisons: The Prison Subculture of Masculinity as a Backdrop for "Deliberate Indifference,"* 92 J. Crim. L. & Criminology 152 (Fall 2001/Winter 2002)).

were no surveillance cameras in the area even though it was in a location where suicidal inmates were housed.[25]

Detective Smith's report reflects that Authement is of a small stature.  The report indicates that at the time, Authement, a caucasian male, was 26 years old standing 5'3" tall and weighing 115 pounds.[26]  At this size, he had been raped at least once before in the prison by another inmate, making him a likely target for another attack.[27]  *Accord United States v. K*, 160 F. Supp.2d 421 (E.D.N.Y. 2001) (a person's physical and emotional fragility makes him far more likely than the typical prisoner to suffer sexual violence in prison) (citing, *inter alia*, Kevin N. Wright, *The Violent and Victimized in Male Prison*, 16 J. of Offender Rehabilitation 1, 6, 22 (1991) (sociological studies show that victims of physical, and in particular, sexual assault, in male prisons "tend to be [ ]small, young, and middle class . . . lack mental toughness and are not 'street-wise' . . . appear to be less involved in a criminal culture before incarceration and to have less institutional experience")).[28]

---

[25]Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, p. 4.

[26]Rec. Doc. No. 60, Court's Trial Exhibit 1, Investigation Report, dated 7/27/09.

[27]*See also*, *Truths About Sexual Abuse in U.S. Detention Facilities*, Fact Sheet (Just Detention International, Washington D.C.), Feb. 2009, at 1 (citing Christopher D. Man & John P. Cronan, *Forecasting Sexual Abuse in Prisons: The Prison Subculture of Masculinity as a Backdrop for "Deliberate Indifference,"* 92 J. Crim. L. & Criminology 152 (Fall 2001/Winter 2002)).

[28]The Court also cited the following other sources in support of the finding that smaller, weaker inmates are targeted for assault in prisons: Peter L. Nacci & Thomas R. Kane, *Inmate Sexual Aggression: Some Evolving Propositions, Empirical Findings, and Mitigating Counter-Forces* at 9 (1984) (studies of rape in federal prisons reveal that "the target is singled out by assailants quickly as one who (1) is generally weak and exploitable and (2) 'appropriately' feminine. This volatile combination of circumstances, coupled with the fact that the environment is geographically restricted and avoidance is difficult makes the case of sex pressuring mortally dangerous."); *AIDS in Prisons*, N.Y. Times, May 21, 2001, at A16 ("Forcible sex" is "widespread" in prisons, and "[t]he AIDS rate is seven times higher in state and federal prisons than in the population as a whole"); Charles Fried, *Reflections on Crime and Punishment*, 30 Suffolk U.L.Rev. 681, 682 (1997) ("I am concerned by the failure of some American prison systems to assure the physical safety of its inmates and by the widespread regime of intimidation by stronger, organized inmates against the weaker or less experienced inmates."); David M. Siegal, Note, *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter*, 44 Stan. L. Rev. 1541, 1545 (1992) ("Rape in prison occurs brutally and inevitably ... [o]ften, the younger, smaller, or less streetwise inmates are the victims."); Martin L. Haines, *Prison Rape Highlights the Need for Better Prison Administration*, 154 N.J.L.J. 23 (Dec. 14, 1998) ("Estimates of the

The record also reflects that Naquin gave Authement Tylenol after he reported the incident. While this was done without an examination, she must have believed that something had occurred to cause him discomfort or injury sufficient to warrant this medication, and further there is no indication in the record that she provided him any treatment for his shoulder.

Naquin also immediately reported his claim to the prison officials, but still no one called for him to be examined.  Instead, the matter was, "per policy," turned over to the detective bureau for investigation.  Although Detective Smith indicated that at some point he thought it odd that Authement was never examined, he too never sent Authement for examination.

While it is true that a rape kit would not have been helpful, since no hair or bodily fluids were involved, an examination may have revealed a tear, bleeding, etc., or confirmed that nothing at all  happened or only a *de minimis* injury was caused.  Having reviewed this case, the Court finds that the argument based on lack of physical evidence of injury, or the extent of injury, is not persuasive.  The Defendants cannot avoid examining the inmate's injury complaints only to rely on the lack of evidence as a defense.  Nevertheless, "sexual assaults against inmates by prison guards without lasting physical injury may be actionable under the Eighth Amendment as acts which are 'offensive to human dignity.'"  *See Copeland v. Nunan*, 250 F.3d 743, 2001 WL 274738, at *2 (5th Cir. Feb. 21, 2001) (Table, Text in Westlaw) (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1196-97 (9th Cir. 2000) (addressing the rape of prisoner)).

Based on the foregoing, the Court finds that Corporal Jaccuzzo acted with intent and was indifferent and excessive in handling Authement, an inmate who was notably physically and mentally impaired at the time, after removing him from the cell by placing his finger in his anus in

---

number of rapes occurring in prisons, countrywide, run as high as 7,000 per day, a figure said to be conservative .... Gang rape is common.").

response to Authement's perceived disruptive behavior.[29]  *See Morris v. Trevino*, 301 Fed. Appx.
310 (5th Cir. Nov. 25, 2008).  Authement is entitled to redress.

### B.   Battery Under Louisiana Law

Having so resolved the excessive force claim under § 1983, the Court finds that the same
testimony and evidence discussed in detail above supports Authement's state law claim of battery.
Under Louisiana law, the intentional tort of battery is a harmful or offensive contact with a person,
resulting from an act intended to cause the plaintiff to suffer such a contact.  *Quebedeaux v. Dow
Chemical Co.*, 837 So.2d 127 (La. App. 1st Cir. 2002) (citing *Caudle v. Betts,* 512 So.2d 389, 391
(La.1987)).  Thus, no matter the extent of Authement's injury, the totality of the evidence establishes
that Corporal Jaccuzzo intentionally committed a harmful touching by placing his finger in
Authement's anus as part of his discipline tactics.  There is no evidence that Authement in any way
caused or contributed to the deputy's use of force in this way.  Authement is entitled to damages.

### C.   Negligence Under Louisiana Law

The final claim before the Court is the state law negligence claim against Major Lirette for
failing to provide or obtain medical attention for Authement.  The fundamental principle of tort
liability in Louisiana is that every act "of man that causes damage to another obliges him by whose
fault it happened to repair it."  La. Civ. Code art. 2315. Thus, in a negligence action under La. Civ.

---

[29]The Court notes that the Defendant did raise the defense of qualified immunity in his answer to Authement's
complaint.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar
as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would
have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The courts utilize a two-step analysis to determine
whether officials are entitled to qualified  immunity for a constitutional violation.  *See Saucier v. Katz*, 533 U.S. 194,
201 (2001), *overruled in part on other grounds by Pearson  v. Callahan*, __ U.S. __, 129 S.Ct. 808, 813 (2009); *see also
Collier*, 569 F.3d at 217.  In one step, the courts will determine whether the plaintiff has alleged a violation of a
constitutional right and, in the other step, whether the officers' conduct was objectively reasonable in light of clearly
established law at the time the challenged conduct occurred.  *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005)
(citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  The Court finds that Jaccuzzo is not entitled to qualified
immunity since a reasonable officer at the time would have known that sticking his finger in an inmate's anus as some
sort of discipline or disciplinary threat for misbehavior unrelated to the need for a cavity search violated the Eighth
Amendment.

Code art. 2315 and La. Civ. Code art. 2316,[30] the plaintiff bears the burden of proving fault, causation and damages. *Cobena v. Metro Disposal, Inc.*, No. 02-CA-1062, 2003 WL 1025030, at *2 (La. App. 5th Cir. 2003) (citing *Wainwright v. Fontenot,* 774 So.2d 70 (La. 2000)).

Under La. Civ. Code Art. 2316, negligence claims are examined by using a duty/risk analysis, wherein the plaintiff must prove each of the following elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). *Hanks v. Entergy Corp.*, 944 So.2d 564, 579 (La. 2006). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. *Hyatt v. DDI Ventures, Inc.*, No. 02-1315, 2003 WL 1983822, at *1 (La. App. 3rd Cir. 2003) (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318 (La. 1994)).

In accordance with Louisiana law, the Warden had a duty to provide reasonable medical care to Authement. *Harper v. Goodwin*, 930 So.2d 1160 (La. App. 2d Cir. 2006). Louisiana law states that prison authorities owe a duty of reasonable care to protect inmates from harm. *Hardy v. Foti*, 812 So.2d 792 (La. App. 4th Cir. 2002); *Williams v. Kelone*, 560 So.2d 915 (La. App. 1st Cir. 1990). Prison officials also owe a duty to provide inmates with reasonable medical care. *Robinson v. Stalder*, 734 So.2d 810 (La. App. 1st Cir. 1999); *Roy v. Phelps*, 488 So.2d 468 (La. App. 3rd Cir. 1986).

---

[30]La. Civ. Code art. 2316 provides: "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

The next question is whether the Major Lirette, under the facts before the Court, breached that duty and whether that breach caused him injury.  Authement testified that he notified Major Lirette about his need for care and that it was Major Lirette, not necessarily the medical staff, that refused to provide him with or send him for treatment.  The evidence before the Court demonstrates that Major Lirette, the Warden, was on notice as early as June 22, 2009, that Authement claimed that he had been sexually assaulted.  Major Lirette testified that the serious nature of Authement's complaint was such that it compelled him to call the detective bureau in to investigate, rather than keep it in-house.  Major Lirette conceded that he made no effort at that time to determine whether the prison staff or the medical staff, which is not under his authority, had Authement examined.

In fact, Major Lirette testified that he never made any effort to see that Authement was treated or examined.  He assumed instead that medical would have examined him if he needed it or that the detective bureau would have him examined if needed during its investigation.  Even with this, Major Lirette had no mechanism in place to assure that care was given to the victim nor did he make an effort to determine whether care was actually provided.

Curiously, like Major Lirette, each of the defense witnesses assumed someone else would have taken care of Authement's medical needs.  Each of the defense witnesses testified that, under the circumstances of the accusations made, Authement should have received a medical examination and treatment pursuant to the investigatory policies.  This would have been accomplished either by sending him to the prison medical unit or the Leonard J. Chabert Medical Center in Houma, Louisiana.  The witnesses also each conceded that none of them referred Authement for an examination anywhere.  Instead, each witness assumed that someone else had done so.  This, of course, departs from the testimony from these same witnesses, and the plaintiff, that Authement continued to complain and inform prison personnel that he was not being treated after the assault.

The evidence also established that Major Lirette was personally on notice of Authement's complaints that no care was provided.  Major Lirette received at least one written request (referred to as a grievance at trial) in which Authement reiterated the fact that his requests for medical examination had never been honored.  Rather than refer him to medical or have his staff send him to medical or to the hospital, Major Lirette simply advised Authement that the investigation had been completed and resolved against him.  While there is no doubt that this was true, it was not responsive to the request before Major Lirette.

The request before Major Lirette was to have Authement seen for a medical exam.  The evidence indicated that when necessary, the guards would take inmates to the medical unit.  For example, the witnesses testified that Authement was taken to medical for an evaluation after his suicide attempt.  It was certainly possible for Major Lirette to have Authement escorted to medical to request that he be evaluated even though the medical unit is separate from the jail administration itself.

The main concern, from a negligence perspective, is that the prison officials, specifically Major Lirette, had a duty to assure that reasonable care was provided to Authement.  In spite of Major Lirette's knowledge that Authement claimed to have been abused by a guard, and in spite of his knowledge that Authement had never been examined or treated for his continued complaints of rectal bleeding, Major Lirette made the final call to deny his requests.  As a result of Major Lirette's breach of his duty to assure that Authement received reasonable care, Authement continued to at least suffer some physical and mental discomfort causing him compensable damage.  The Court therefore finds that Authement is entitled to damages as a result of Major Lirette's negligence.

The Court is compelled to consider Major Lirette's defense, raised in the answer, that Authement is comparatively at fault for his own injury or damage.  Louisiana's comparative fault statute provides that "[w]hen contributory negligence is applicable to a claim for damages," the

amount of damages recoverable is reduced in proportion to the degree of negligence attributable to the plaintiff.  La. Civ. Code art. 2323; *BellSouth Telecomm., Inc. v. Johnson Bros. Corp. of Louisiana*, 106 F.3d 119, 124 (5th Cir. 1997) (*citing Nealy v. LeBlanc*, 654 So.2d 468, 471 (La. App. 1st Cir. 1995)).

The Defendants relied heavily on the argument that Authement did not specifically make requests for medical care to the medical staff after the first few days following the assault.  The evidence, however, clearly showed that Authement continued to request assistance during and after the investigation. Each of these requests were denied because of the investigation process.  This was conceded by the defense witnesses.

The evidence further established that, no matter what Authement did, his requests were met with policy responses.  Prison policy required the medical staff to contact the disciplinary personnel to report the incident.  According to the testimony, while the prison had a reporting policy in place, and everyone assumed the victim would receive care, there was nothing in place to assure that the victim did get care no matter how many times he complained.

As was shown at trial, once this process began, Authement's requests were in vain and denied because the investigation was on-going or completed.  There was no evidence at trial that anything different would have occurred even had Authement barraged the medical unit with requests for care.

There is no question that he informed the medical staff and the prison staff of the assault and of his need for treatment.  Even at his first reporting, the EMT gave him Tylenol which at least shows that he reported some discomfort.  As noted above, this too reflects that Naquin at least suspected foul play and possible injury, and still no examination was done.  Even after that, no examination or other treatment was ever provided or allowed.  The record contains no basis for this Court to find that Authement contributed to the denial of care for his injuries.

Accordingly, for the foregoing reasons, and considering the evidence adduced at trial,

**IT IS ORDERED** that there be judgment in favor of the Plaintiff, Terry Peter Authement, Jr., and against the Defendant, Corporal Matthew Jaccuzzo, on the claim of excessive force under 42 U.S.C. § 1983 in the amount $1,000.00 in compensatory damages and on the claim of battery under Louisiana law in the amount of $1,000.00 in compensatory damages, each party to bear their own costs.

**IT IS FURTHER ORDERED** that there be judgment in favor of the Plaintiff, Terry Peter Authement, Jr., and against the Defendant Major LeeRoy Lirette, Warden of Terrebonne Parish Criminal Justice Complex, on the claim of negligence under Louisiana law in the amount of $1,000.00 in compensatory damages, each party to bear their own costs.

New Orleans, Louisiana, this 7th day of December, 2010.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**